## AFFIDAVIT OF SPECIAL AGENT MATTHEW D. ELIO

I, Matthew D. Elio, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Boston, Massachusetts Field Office. As a FBI Special Agent, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of and make arrests for offenses enumerated in that section. I joined the FBI in October 2005. In February 2006, I was assigned to the Bridgeport, Connecticut Resident Agency of the FBI's New Haven Division, where I was assigned to a Public Corruption and White Collar Crime squad. In June 2009, I was transferred to the Boston Division and spent approximately two years working on a Health Care Fraud squad before being re-assigned to the Public Corruption Squad in December 2011.

2. I am submitting this affidavit in support of a criminal complaint charging DANA A. PULLMAN and ANNE M. LYNCH with conspiracy to commit honest services wire fraud, honest services wire fraud, and wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and 1349, as well as obstruction of justice in violation of 18 U.S.C. § 1503.

3. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. In submitting this affidavit, I have not included every fact known to me about this investigation. Instead, I have only included facts that I believe are sufficient to establish probable cause for the requested complaint.

# BACKGROUND

### A. General Background

*The State Police Association of Massachusetts ("SPAM")*

4. During the relevant time period, the State Police Association of Massachusetts ("SPAM") was an association consisting of more than 1,500 Troopers and Sergeants from the Massachusetts State Police ("MSP"). SPAM acted as the exclusive bargaining agent between its members ("the Membership") and the Commonwealth of Massachusetts ("the Commonwealth") regarding the terms and conditions of the Membership's employment.

5. SPAM had four paid Constitutional Officers: President, Vice President, Treasurer and Secretary. The President and Treasurer of SPAM held those positions full-time. Under the terms of the SPAM By-Laws, the President had "general supervision over the affairs of the Association." Upon election, the President and Treasurer held office for two-year terms. The President also served as the Chairman of the SPAM Executive Board ("E-Board"). The E-Board consisted of the four Constitutional Officers and approximately eleven representatives of the various troops of the MSP ("Troop Reps"). Upon election, the Troop Reps held office for one-year terms.

*SPAM's Finances*

6. SPAM's primary source of income was the dues the Membership paid to SPAM. Upon graduation from the MSP Academy, the vast majority of new MSP troopers became members of SPAM and paid dues to SPAM through automatic deductions from their paychecks. Among the more significant expenses that SPAM incurred and reported to the Membership were the salaries it

paid to the E-Board members and professional fees paid to attorneys and a lobbying firm ("the Lobbying Firm") pursuant to retainer agreements.

7.      SPAM paid each member of the E-Board a SPAM salary and a $1,000 quarterly stipend, in addition to his or her regular MSP salary. Members of the E-Board could also receive reimbursement checks for SPAM related expenses such as meals, travel, and mileage reimbursement for the use of their personal vehicles for SPAM business by submitting expense reports, often called "rip sheets," to SPAM's Treasurer. In addition to their purported expense reimbursements, the President and Treasurer each had a SPAM debit card, linked to a SPAM bank account, with which they could make expenditures for SPAM related travel and business.

8.      Each year, a local accounting firm ("the CPA Firm") conducted an audit of SPAM's finances. At the close of each calendar year, the CPA Firm presented audited financial statements to the E-Board for their signature and approval. Thereafter, at the beginning of each following year, the CPA Firm presented condensed financial statements to the Membership at SPAM's annual meeting.

*The E-Board*

9.      According to SPAM's By-Laws, the E-Board had "the entire charge, control and management of the SPAM, including its business, property and affairs[.]" Furthermore, under its By-Laws, at all meetings of the SPAM Membership and of the E-Board, only "a majority of the Association members in good standing of each body present and voting [had] the power to transact business and to determine the disposition of any matter properly presented at such meeting[.]" The E-Board met twice a month and maintained records of their meetings, votes and decisions through minutes prepared by the Secretary.

10. In addition to bi-monthly E-Board meetings, SPAM also held an annual meeting of the Membership in January at a hotel in Framingham, Massachusetts. The annual meetings included presentations from SPAM's Constitutional Officers, the CPA Firm regarding SPAM's financial position as compared to the previous year along with condensed financial statements of revenue and expenses, and the Lobbying Firm regarding legislation and other issues affecting the Membership.

*SPAM's Lobbying Firm*

11. The "Lobbying Firm" was a lobbying and public relations firm based in Boston, Massachusetts. Between approximately 2008 and the end of 2018, the Lobbying Firm represented SPAM before government agencies and legislative committees and advocated regarding issues and state legislation on SPAM's behalf. SPAM paid the Lobbying Firm a monthly retainer fee of approximately $7,000 for lobbying work and, beginning in approximately 2016, paid the Lobbying Firm an additional $2,500 per month for public relations work.

*Defendant DANA A. PULLMAN*

12. From approximately 2012 until on or about September 28, 2018, defendant DANA A. PULLMAN ("PULLMAN") was the President of SPAM. Prior to becoming President, from approximately 2008 until 2012, PULLMAN was SPAM's Treasurer. PULLMAN first joined the MSP as a Trooper in approximately 1987. As a law enforcement officer and the President of SPAM, PULLMAN owed a fiduciary duty and a duty of honest services to SPAM, the Membership, and the Commonwealth to perform his job and official duties free from fraud, deceit, and self-enrichment and to refrain from accepting, or agreeing to accept, bribes and kickbacks.

*Defendant ANNE M. LYNCH*

13. Defendant ANNE M. LYNCH ("LYNCH") founded the Lobbying Firm in approximately 2001, and until approximately October 2016 was its principal owner. LYNCH was a long-time friend of PULLMAN and often coordinated fundraisers for political candidates supportive of the MSP for SPAM. Following her retirement from the Lobbying Firm, effective as of approximately October 2016, LYNCH sold the business to two family members, including a lobbyist ("the Lobbyist"), but continued to work for the Lobbying Firm as a paid consultant, including performing work for SPAM.

**B. Background of the Investigation**

14. In or about July 2018, federal investigators from the FBI and the Internal Revenue Service, Criminal Investigation ("IRS-CI") began an investigation of SPAM and its then President, PULLMAN. By at least as early as approximately October 2018, agents were investigating SPAM and PULLMAN's relationship with LYNCH and the Lobbying Firm. Thus far, the investigation has included, among other things, the review of numerous documents, e-mails and records, as well as the interviews of multiple witnesses.

15. As further detailed in the factual summary below, the investigation has revealed that from at least 2012 and continuing until PULLMAN's resignation as the President of SPAM on or about September 28, 2012, PULLMAN, LYNCH and others were involved in a scheme and a conspiracy to defraud the Membership and the Commonwealth of their right to honest services from PULLMAN through fraud and deceit, including PULLMAN's receipt of illegal bribes and kickbacks from LYNCH and the Lobbying Firm. The investigation also revealed that PULLMAN, LYNCH and others were involved in a scheme and a conspiracy to defraud two different

5

companies seeking to do business with the Commonwealth of money and property through material misrepresentations and omissions.

16. The investigation further revealed that while President of SPAM, PULLMAN frequently embezzled and misused SPAM funds for his personal use through: (1) the use of a debit card tied to a SPAM bank account; (2) frequent SPAM expense reimbursement checks unsupported by receipts; and (3) by circumventing and bypassing the role of SPAM's governing E-Board. The embezzlement of SPAM funds included the use of the SPAM debit card to pay for meals, flowers, travel, and gifts for an individual with whom PULLMAN was having a romantic relationship.

17. As President of SPAM, PULLMAN also encouraged the members of SPAM's E-Board to submit falsified expense reports. For example, during their bi-weekly meetings, PULLMAN at times encouraged members of the E-Board to submit mileage expense reports for the use of their personal vehicle (even though they used their MSP vehicle) in order to cover other uncompensated expenses including political contributions they were expected to make.

18. Finally, as further described below, as President of SPAM, PULLMAN sought to protect and increase both his and SPAM's power and authority through the intimidation of others and the obstruction of the federal investigation into SPAM.

## SUMMARY OF THE EVIDENCE

**A.  The $20,000 Payment to PULLMAN from the DOL Settlement**

19. In approximately 2005, SPAM filed a grievance on behalf of the Membership with the MSP and the Commonwealth that alleged that the MSP had not properly compensated MSP employees for working scheduled days-off (referred to as "days-off lost," or "DOLs"). While the

grievance was stalled for several years, it was ultimately resolved through a written settlement in 2014.

20. In support of the grievance, beginning in approximately 2012, SPAM rented additional office space, hired temporary employees and engaged the Lobbying Firm to supervise and manage the collection and review of MSP employees' (and former employees') records and work calendars and calculate a total number of days-off lost ("the DOL Project") for which the Membership would be compensated.

21. By approximately July 2013, the MSP and SPAM had reached a tentative multi-million dollar settlement under which current and former MSP employees would receive payment for uncompensated work. Ultimately, the MSP agreed to pay the participants in the DOL settlement more than $22 million.

22. Between approximately July 2013 and August 2014, while PULLMAN, LYNCH and the Lobbyist were negotiating the final terms of the DOL settlement with representatives from the MSP and the Commonwealth, PULLMAN negotiated for a provision of the agreement for SPAM to recover a portion of the approximately $700,000 in expenses SPAM claimed it had incurred in pursuing the grievance.

23. According to one of the participants in the negotiations from the Commonwealth, compensating SPAM for its expenses was one of the sticking points of the deal because the Commonwealth repeatedly asked PULLMAN for, but did not receive, documentation and receipts evidencing SPAM's expenses. Instead, PULLMAN told the representative of the Commonwealth that he was going to "stalk" the Governor's Deputy Chief of Staff about the issue. Ultimately, though earlier drafts of the DOL agreement stated that the Commonwealth would compensate

SPAM $350,000 for its expenses only upon receipt of documentation, the requirement for documentation was removed and a final agreement was reached. PULLMAN signed the agreement on behalf of SPAM on or about August 5, 2014 and it became final on or about August 7, 2014 ("the DOL Settlement").

24. The DOL Settlement was announced to the Membership at a meeting at the Best Western Hotel in Marlboro on September 10, 2014 that included presentations from PULLMAN and LYNCH. The DOL Settlement included a provision that required the Commonwealth "to compensate SPAM $350,000 for costs incurred in pursuing this matter," an amount equal to roughly half SPAM's expenses as claimed by PULLMAN. In accordance with the agreement, on or about October 15, 2014, the Commonwealth issued a $350,000 check to SPAM.

25. Prior to issuance of the $350,000 check by the Commonwealth, between June 2013 and February 2014, SPAM had paid the Lobbying Firm a total of $100,000 for its work on the DOL Project. After receipt of the $350,000 check from the Commonwealth, PULLMAN asked the then treasurer of SPAM ("the Treasurer") for a check for $250,000 to pay the Lobbying Firm.

26. According to the Treasurer, when the Treasurer learned that SPAM was going to pay the Lobbying Firm a total of $350,000 for its work on the DOL Project, the Treasurer complained to PULLMAN that SPAM was "getting screwed." As a result, PULLMAN pounded the table and yelled, "Stop breaking my f**king balls and give me the check!" The Treasurer relented and gave PULLMAN a check for $250,000 payable to the Lobbying Firm. According to SPAM's accounting records, the $250,000 was for "DOL Project Final Payment." The check was deposited into the Lobbying Firm's account on or about November 6, 2014.

27. On or about November 10, 2014, LYNCH handwrote a $50,000 check, payable to herself, from the Lobbying Firm's bank account. The check was characterized on the Lobbying Firm's records as an "Owner's Draw," *i.e.*, funds LYNCH withdrew from the company for herself.

28. The next day, on or about November 11, 2014, LYNCH deposited the $50,000 check into her personal bank account, and on the same date wrote a $20,000 check drawn on her personal bank account to PULLMAN's spouse.

29. The next day, on or about November 12, 2014, the $20,000 check was deposited into PULLMAN's joint personal bank account with his spouse at Commerce Bank.

30. Between September 2015 and November 2015, following an inquiry from the Lobbying Firm's accountant, the classification of LYNCH's $50,000 "Owner's Draw" was changed on the Lobbying Firm's records to a $50,000 payment to PULLMAN's spouse as a "consulting fee," even though neither PULLMAN nor his spouse ever did any consulting work for the Lobbying Firm and the check payable to PULLMAN's spouse was $20,000 and not $50,000.

31. The investigation revealed that PULLMAN and LYNCH purposely concealed the $20,000 bribe and kickback paid by LYNCH from the E-Board, the Membership, the CPA Firm and the Commonwealth. While SPAM reported annually to the Membership information about the money it spent, including the salaries it paid to its officers, PULLMAN never informed the Membership about the money he received from LYNCH in connection with the DOL Settlement. Similarly, during the course of their dealings with the Commonwealth about the DOL Settlement, neither LYNCH nor PULLMAN ever made any mention to representatives from the Commonwealth and the MSP that PULLMAN would personally be receiving a portion of the money from the $350,000 cost reimbursement.

32.     Furthermore, based on information provided by a representative from the Commonwealth involved in the DOL Settlement negotiations, the Commonwealth would not have engaged in negotiations with PULLMAN, LYNCH and the Lobbying Firm, and would not have agreed to pay SPAM $350,000 for its expenses, had it been aware that PULLMAN was going to receive a $20,000 bribe and kickback from LYNCH and the Lobbying Firm.  According to the representative, as President of SPAM, PULLMAN's activities in connection with the DOL Settlement would have been covered by his MSP and SPAM salaries.

**B.      The $5,000 Payment to PULLMAN for the $20,000 Contract with Company A**

33.     By at least sometime in 2014, a small, closely held technology company based in New York ("Company A") was developing and marketing computer software programs, CAD (Computer Aided Dispatch) and RMS (Records Management System), to various law enforcement agencies including the MSP.  In or about March 2014, a member of the MSP involved in law enforcement technology encouraged one of the owners and employees of Company A ("Employee A") to make a presentation regarding their products to PULLMAN in order to foster PULLMAN's and SPAM's support for Company A to eventually obtain a procurement contract with the Commonwealth.

34.     Around the same time, on or about April 30, 2014, the Executive Office of Public Safety and Security ("EOPSS") for the Commonwealth publically issued a Request for Response ("RFR"), soliciting written proposals for a "CAD/RMS Modernization Solution."  The deadline for the RFR submissions was originally July 30, 2014, but it was later extended to August 27, 2014.

10

35. On or about July 25, 2014, at SPAM's offices in Boston, Employee A gave PULLMAN, the Treasurer and others a short demonstration about Company A's product and vision for a CAD/RMS system. Following the presentation, PULLMAN encouraged Employee A and Company A to hire LYNCH and the Lobbying Firm in order to help Company A prepare and submit a response to the pending RFR.

36. On or about July 26, 2014, at approximately 3:18 p.m., in response to an email[1] to PULLMAN and the Treasurer thanking them for the meeting the day before, PULLMAN informed Employee A that LYNCH would soon be contacting Employee A and described LYNCH as *"a true expert in the state of Mass procurement process[.]"*

37. On or about August 11, 2014, LYNCH and the Lobbyist met with Employee A about the RFR at SPAM's offices in Boston. Days before the meeting, on or about August 7, 2014, at approximately 6:18 p.m., LYNCH emailed Employee A and indicated that she and the Lobbyist had reviewed the RFR and were *"prepared to offer some meaningful insights on your submission options."*

38. Thereafter, Employee A, on behalf of Company A, entered into a written contract with the Lobbying Firm whereby Company A agreed to pay the Lobbying Firm $20,000 for professional services rendered.

39. On or about August 18, 2014, the Lobbying Firm emailed a $20,000 invoice to Company A. On or about September 14, 2014, Company A paid the invoice via an interstate wire transfer from Company A's bank account to the Lobbying Firm's bank account.

---

[1]Unless otherwise indicated, each of the emails, wire transfers of funds, and deposits of funds into bank accounts were interstate wires.

40. On or about August 20, 2014, the Lobbying Firm issued a $5,000 check to PULLMAN in exchange for PULLMAN's directing Company A to hire the Lobbying Firm. The check was described as a "commission expense" on the Lobbying Firm's records, and a copy of the check record was stored in the Lobbying Firm's hard copy file for Company A. The check was later deposited into PULLMAN's joint personal checking account with his spouse.

41. PULLMAN and LYNCH purposely concealed the Lobbying Firm's payment to PULLMAN from Employee A and Company A. Employee A and Company A would not have paid the Lobbying Firm $20,000 had it known about the illicit arrangement between PULLMAN, LYNCH, and the Lobbying Firm. According to the Employee A, based on more recent experience with RFR and procurement contracts, the caliber of the Lobbying Firm's work on the RFR was vastly overpriced and not worth $20,000. In addition, PULLMAN purposefully concealed the $5,000 bribe and kickback from SPAM and the Membership in violation of his fiduciary duty and his duty of honest services.

C. **The $5,000 Payment to PULLMAN for a Meeting Arranged for Company B**

42. Between in or about April 2015 and February 2016, a regional sales manager ("Employee B") for an Arizona-based company whose primary product was a smart weapon ("Company B") attempted to market and sell Company B's smart weapons to both the MSP and the Massachusetts Department of Corrections ("DOC").

43. On or about April 9, 2015, Employee B met with PULLMAN and the Treasurer at SPAM's offices in Boston to discuss a proposed contract, potentially worth millions of dollars, for full deployment of smart weapons to each member of the MSP. During the meeting, PULLMAN encouraged Employee B to hire LYNCH and the Lobbying Firm. Among other things,

PULLMAN told Employee B that LYNCH and the Lobbying Firm could assist Company B in obtaining appropriations from the Massachusetts state legislature to fund the purchase of smart weapons for the MSP.

44.     Despite the fact that Company B already had a Boston area lobbying firm on retainer, PULLMAN pressured Company B to also hire the Lobbying Firm. Based on PULLMAN's words and actions, Employee B believed that Company B would not be able to sell smart weapons to the MSP if it did not hire the Lobbying Firm.

45.     Between in or about October 2015 and May 2016, Company B paid the Lobbying Firm a total of $138,000, purportedly for the Lobbying Firm's efforts to lobby the state legislature for an appropriations bill to fund the full deployment of smart weapons to the MSP. While other sources of funding ultimately paid for a partial deployment of smart weapons to the MSP, by June 2016, legislative funding for smart weapons was no longer feasible and Company B discontinued its contract with the Lobbying Firm.

46.     Apart from Company B's efforts to sell smart weapons to the MSP, Employee B, on behalf of Company B, was also attempting to market and sell smart weapons to the DOC. In or about February 2016, the Lobbyist offered to introduce Employee B to the Undersecretary of Criminal Justice within EOPSS ("the Undersecretary") to facilitate a contract with DOC. According to the Lobbyist, PULLMAN knew the Undersecretary and could arrange the meeting. On February 10, 2016, the Lobbyist sent Employee B a text message that read, *"Meeting with [the Undersecretary]. He is getting back to me in 30 with a time for tomorrow."*

47.     On or about February 11, 2016, the Lobbyist and Employee B met with the Undersecretary about the potential sale of smart weapons to the DOC. The same day, after the

meeting, the Lobbyist sent a text message to PULLMAN thanking him for arranging the meeting, and wrote, *"Unbelievable meeting with [the Undersecretary]. Thank you!"*

48. On February 15, 2016, Employee B sent an email to the Undersecretary and other DOC representatives with price quotes. The same day, on or about February 15, 2016, LYNCH paid PULLMAN $5,000 for PULLMAN's dealings with Company B - including directing Company B to the Lobbying Firm and arranging the meeting between Employee B and the Undersecretary. LYNCH made this payment to PULLMAN from her personal bank account, but the funds used to make the payment were traceable to a $5,000 check payable to LYNCH drawn on the Lobbying Firm's account. The $5,000 check to LYNCH was falsely characterized on the Lobbying Firm's records as a payment to "Boston Consulting Group" for a "consulting fee." The $5,000 check drawn on LYNCH's personal account and payable to PULLMAN was deposited into PULLMAN's joint personal bank account with his spouse.

49. PULLMAN, LYNCH and the Lobbying Firm concealed this payment from Company B. Employee B and Company B would not have not have entered into a contract with the Lobbying Firm and paid it a total of $138,000 had it known about the illicit arrangement between PULLMAN, LYNCH, and the Lobbying Firm. In addition, PULLMAN purposefully concealed the $5,000 bribe and kickback from SPAM and the Membership in violation of his fiduciary duty and his duty of honest services.

**D.     PULLMAN's Misuse and Embezzlement of SPAM Funds**

50. While President of SPAM, PULLMAN purposely embezzled and misused SPAM funds through the use of a SPAM debit card, reimbursement checks, and by circumventing and bypassing the roles of the E-Board and the CPA Firm.

51.     Between at least January 2014 and continuing until at least August 2018, PULLMAN knowingly used a SPAM debit card linked to a SPAM checking account for personal spending that PULLMAN concealed from SPAM, the E-Board and the Membership including, but not limited to, the following:

a.      Between in or about May 2015 and August 2018, PULLMAN used the SPAM debit card to purchase a total of approximately $9,300 in flowers and gift baskets from Winston Flowers for family and friends unrelated to SPAM business, including more than approximately $4,400 in flowers and gifts for an individual with whom PULLMAN was having a romantic relationship ("Individual #1").

b.      Beginning sometime in or about 2016 and continuing until August 2018, PULLMAN used the SPAM debit card to pay for more than $8,000 in personal meals with Individual #1 at restaurants in the Boston area, as well as for meals with PULLMAN's family near his residence.

c.      On or about October 18, 2016, PULLMAN used the SPAM debit card to pay approximately $468 for a lunch with Individual #1 at Marea restaurant in New York that PULLMAN falsely claimed was related to a National Trooper Coalition ("NTC") meeting. The bill for the lunch included approximately $150 for caviar.

d.      Between in or about February 17, 2017 and March 1, 2017, PULLMAN used the SPAM debit card to pay approximately $276 to American Airlines for a flight from Boston to Miami, Florida; $385 to Lure Fishbar restaurant in Miami Beach, Florida; $829 to Hertz Rent-A-Car in Miami, Florida; and $2,113 to the Palms Hotel in Miami Beach, Florida for a personal getaway with Individual #1 that PULLMAN falsely claimed was related to a NTC meeting.

e. Between in or about January 2014 and July 31, 2018, PULLMAN used the SPAM debit card to pay approximately $2,000 for iTunes charges unrelated to SPAM business.

52. PULLMAN also obtained reimbursement checks and other personal benefits without following SPAM's established procedures and without the approval of the E-Board. For example, in 2016, PULLMAN received more than $40,000 in expense reimbursement checks although PULLMAN submitted expense sheets to the Treasurer for less than $9,000 of those purported expenses.

53. PULLMAN also bypassed the E-Board and caused significant expenditures of SPAM money to be paid to third parties without approval. For example, on or about March 28, 2017, PULLMAN signed a $10,000 SPAM check payable to a Quincy, Massachusetts non-profit organization. Even though members of the E-Board frequently sought E-Board approval to make donations of $500 or more, PULLMAN did not seek approval from the E-Board. The check was for a charitable donation that included the purchase of a 10-person table and dinner at the organization's annual gala charity event in Boston, Massachusetts that PULLMAN attended with Individual #1.

54. In or about November 2017, PULLMAN and the Treasurer leased a 2017 Chevrolet Suburban valued at approximately $75,760 for PULLMAN by issuing two checks from SPAM's account totaling $21,371 as a down payment, without the approval or knowledge of the E-Board.

55. As President of SPAM and the leader of the E-Board, PULLMAN also at times encouraged the members of the E-Board to submit false reimbursement requests to cover personal expenses that should not have been reimbursed by SPAM, including personal meals and political

donations. Several members of the E-Board followed PULLMAN's guidance and submitted false expense reimbursement requests to the Treasurer.

E.   **PULLMAN and LYNCH's Efforts to Obstruct Justice**

   *The Missing Reimbursement Records*

   56.   Beginning in or about July 2018, a federal grand jury in the District of Massachusetts began issuing grand jury subpoenas to SPAM for records, including a subpoena issued on or about September 18, 2018 for records relating to expense reimbursements sheets, called "rip sheets." The Treasurer typically maintained SPAM's reimbursement records – including rip sheets and copies of any receipts submitted with the rip sheets – for each E-Board member in his SPAM office at 11 Beacon Street in Boston.

   57.   After receipt of a second grand jury subpoena to SPAM on or about August 1, 2018, the Treasurer told PULLMAN during a telephone call that he suspected SPAM's expense sheets – which had not yet been subpoenaed – would soon be requested by the federal grand jury. At the time of the call, the Treasurer was at home and PULLMAN was at the SPAM office. The next day, the Treasurer was unable to locate E-Board members' expense reimbursement sheets and receipts for the years 2013, 2014, 2015, and 2017. The Treasurer located, and SPAM was able to produce pursuant to a September 18, 2018 grand jury subpoena, expense reimbursement records for the years 2016 and 2018.

   58.   Between on or about September 18, 2018 – when SPAM actually received a grand jury subpoena for records relating to expense reimbursements – and on or about September 28, 2018, when PULLMAN resigned as President of SPAM, PULLMAN contacted an attorney representing SPAM in the grand jury investigation ("SPAM Attorney #1") and asked whether

SPAM Attorney #1 would speak to LYNCH. Shortly thereafter, SPAM Attorney #1 received a call from LYNCH. During the brief call, LYNCH asked SPAM Attorney #1 to delay the production of subpoenaed records to the United States Attorney's Office, because she was helping PULLMAN in collecting receipts for his expenses. SPAM Attorney #1 told LYNCH he was not going to do that. According to SPAM Attorney #1, he was under the impression that LYNCH and PULLMAN were seeking to add records to the production that were not currently in SPAM's possession.

59.   On or about September 27, 2018, while the Treasurer was compiling expense records that he was able to locate that were required to be produced pursuant to a grand jury subpoena issued on September 18, 2018, PULLMAN suggested to the Treasurer that they should falsely tell federal investigators that SPAM had an internal policy to destroy expense reimbursement records after one year. During the same conversation, PULLMAN asked the Treasurer if he should resign and the Treasurer agreed.

*Consensual Interview of LYNCH*

60.   On or about October 17, 2018, IRS-CI Special Agent Sandra Lemanski and I interviewed LYNCH inside her residence. Prior to entering her residence, Agent Lemanski and I introduced ourselves as federal law enforcement agents and asked LYNCH if we could speak with her inside her residence.

61.   Over the course of an approximately two-hour consensual interview, LYNCH falsely denied ever making any payments to either PULLMAN or his spouse from her personal account or from the Lobbying Firm's business account. Specifically, Agent Lemanski and I asked LYNCH if she or anyone from her firm paid any type of kickback or payment to any of her clients

or anyone associated with her clients, including PULLMAN, his spouse or any other member of his family, to which LYNCH responded: no. LYNCH offered that her clients mainly came to her firm by referrals and she has never paid any kickback or given any money to anyone to get a client. During the interview, LYNCH also stated that neither PULLMAN nor any member of his family had ever done any type of work for LYNCH personally, or for the Lobbying Firm.

62. Twice during the interview, Agent Lemanski and I explained to LYNCH that providing false information to federal agents was a crime and provided LYNCH an opportunity to provide truthful information. Despite this, LYNCH maintained that neither she nor the Lobbying Firm ever made any payments to PULLMAN or his spouse. LYNCH also falsely maintained that she had only social conversations with PULLMAN and denied ever having any conversations with PULLMAN about the ongoing grand jury investigation. As described above, in late September 2018, LYNCH spoke with SPAM Attorney #1 about assisting PULLMAN in the collection and production of expense reports and asked SPAM Attorney #1 to delay production of the records.

## CONCLUSION

63. Based on the foregoing, I submit there is probable cause to believe that DANA A. PULLMAN and ANNE M. LYNCH conspired to commit and committed honest services wire fraud and wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 1349, as well as obstruction of justice in violation of 18 U.S.C. § 1503.

Signed under the pains and penalties of perjury this  20  day of August, 2019.

_____
Matthew D. Elio
Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me this  20  day of August 2019.

_____
HON. JENNIFER C. BOAL
U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS